## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MATTHEW ALLEN,
*Plaintiff*,

v.

No. 3:20-cv-1276 (JAM)

RAFIK SIDAROS *et al.*,
*Defendants*.

### ORDER GRANTING MOTION TO DISMISS

The plaintiff has filed this lawsuit against two doctors who were in charge of his care while he was subject to court orders of involuntary commitment and mental health treatment at a state hospital. The plaintiff seeks an award of money damages against the two doctors for violating his constitutional rights. I will grant the doctors' motion to dismiss and deny the plaintiff's motion to join additional parties.

### BACKGROUND

The plaintiff is Matthew Allen. The two defendants are Dr. Rafik Sidaros and Dr. Victoria Dreisbach.[1] The following facts are drawn from Allen's proposed second amended complaint and assumed to be true solely for the purpose of this ruling.[2]

Allen lived alone in a one-bedroom apartment in West Haven, Connecticut.[3] In June 2017, he was arrested by the police for breach of peace and interfering with an officer—both misdemeanors.[4] Allen was 33 years old, and this was the first time he had ever been arrested.[5]

---

[1] Because Dr. Sidaros and Dr. Dreisbach are alleged to work at the state-owned hospital where Allen was involuntarily committed, I assume that they are state actors who may be subject to suit under 42 U.S.C. § 1983. *See Ferguson v. City of Charleston*, 532 U.S. 67, 76 (2001).
[2] Doc. #23. This proposed second amended complaint (amended statement of claim) is substantially the same as the initial complaint with respect to Allen's claims against the defendant psychiatrists except with respect to its proposed addition of two county defendants and a First Amendment claim as discussed later in this ruling.
[3] *Id*. at 3 (¶ 2).
[4] *Id*. at 2 (¶ 1). Allen has a separate pending lawsuit against the officers who arrested him. *See Allen v. O'Neill*, 3:20cv854 (D. Conn.)
[5] Doc. #23 at 1. Allen was subsequently charged in July 2017 with driving under the influence. *Id*. at 5 (¶ 2).

After Allen refused a plea bargain in the Superior Court at Meriden, the presiding judge entered an order for Allen to undergo a psychological evaluation to determine whether he was competent to stand trial.[6]

Dr. Rocksheng Zhong conducted the court-ordered evaluation in August 2017.[7] According to the complaint, Allen presented as mellow, measured, intelligent, and thoughtful—not incompetent or dangerous.[8] Further, Allen says that he understood the nature of the charges against him, the possible penalties, and the way the criminal justice system worked, such that he was competent to stand trial and also qualified to act as his own attorney.[9] Nevertheless, Dr. Zhong found that Allen was not competent to stand trial and recommended Allen's commitment for up to 60 days at the Whiting Forensic Hospital, which Allen refers to as the "Whiting Forensic Hospital for the Criminally Insane."[10] I take judicial notice that the Whiting Forensic Hospital is an entity of the State of Connecticut's Department of Mental Health and Addiction Services and that it "specializes in providing inpatient services to individuals involved in the criminal justice system," including by means of Psychiatric Security Review Board commitment, criminal court order for restoration of competency to stand trial, and voluntary and involuntary civil commitment.[11]

Allen has previously sued Dr. Zhong because of his disagreement with Dr. Zhong's conclusions that led to Allen's commitment. I dismissed this separate lawsuit on the ground that Dr. Zhong was immune from civil liability for performing a court-ordered mental health

---

[6] *Id*. at 2 (¶ 1).
[7] *Id*. at 2-3 (¶ 2).
[8] *Id*. at 3 (¶ 2).
[9] *Ibid*.
[10] *Ibid*.
[11] *See* Conn. Gen. Stat. § 17a-562; Connecticut Dept. of Mental Health and Addiction Services, Whiting Forensic Hospital, *available at* https://portal.ct.gov/DMHAS/WFH/Whiting-Forensic-Hospital (last accessed February 14, 2022).

examination. *See Allen v. Zhong*, 2021 WL 77097 (D. Conn. 2021); *Allen v. Zhong*, 2020 WL 7645431 (D. Conn. 2020).

### *Whiting*

Following another court hearing in Meriden, a state court judge entered an order for Allen's commitment to Whiting in September 2017.[12] At Whiting, Allen alleges that Dr. Sidaros was "entrusted with his care and the sole ability to discharge him once admitted."[13] Allen remained at Whiting for just under three months, during which intervening time Dr. Sidaros did not release him.[14]

Allen alleges that "[a]fter more-or-less impeccable behavior the first 10 days or so, [his] behavior admittedly started to become sometimes inappropriate and hostile, with both staff and other patients," albeit he "never attacked another patient physically, even in self-defense."[15] Although Allen requested to take only Depakote (a mood stabilizer), Dr. Sidaros insisted that he also take an anti-psychotic medication, which caused Allen to suffer depression, anxiety, restlessness, nightmares, other sleep issues, and sexual side effects.[16] Dr. Sidaros obtained an order from the Middlesex probate court allowing him to administer the anti-psychotic over Allen's objection.[17] Allen was willing to take a low dose of the anti-psychotic orally, but Dr. Sidaros insisted on injecting a higher dose of the medication.[18]

In the meantime, about two weeks after Allen's initial admission to Whiting, the State dismissed the criminal charges against him.[19] But instead of discharging Allen, Dr. Sidaros

---

[12] Doc. #23 at 4 (¶ 2).
[13] *Id.* at 2.
[14] *Id.* at 3-4 (¶ 2).
[15] *Id.* at 7 (¶ 5) (spelling corrected).
[16] *Id.* at 7, 10 (¶¶ 4, 9).
[17] *Id.* at 9-10 (¶ 8).
[18] *Id.* at 10 (¶ 9).
[19] *Id.* at 8 (¶ 6).

issued a physician's emergency certificate (PEC) and had him transported from the courthouse back to Whiting.[20]

At a subsequent probate court hearing in Middlesex, Dr. Sidaros secured a court order to have Allen recommitted to Whiting based on false representations to the probate court that he was gravely disabled.[21] According to Allen, the PEC was "unjustified, but if it were, it should have been served at an appropriate Psychiatric facility, not a facility for the criminally insane housing patients guilty of the very most severe crimes."[22] In light of the probate court's order, Dr. Sidaros "was able to force Mr. Allen to take medication."[23]

Shortly after Allen arrived back at Whiting from the courthouse, another patient on his unit punched him very hard in the ear without provocation.[24] Allen and his assailant were both placed under constant observation by hospital staff on "unit restrict" status, barring them from the hospital yard and from participating in activities with other patients.[25] Allen was on unit restrict for over a month, while his assailant was on unit restrict for only a day.[26] Allen was left on the same unit as his assailant, who would often quietly creep up behind him while hospital staff looked on without intervening.[27]

This was not the only documented occasion of unprovoked violence against Allen. Other patients at Whiting regularly challenged Allen to fights, attempted to intimidate him in the group showers, threatened him with violence, and threw "blatant elbows to the face at basketball," but Allen never attacked anyone, even in self-defense.[28] When Allen was on unit restrict and under

---

[20] *Ibid.*
[21] *Id.* at 9 (¶ 8).
[22] *Id.* at 8 (¶ 6).
[23] *Id.* at 10 (¶ 9).
[24] *Id.* at 8 (¶ 7).
[25] *Ibid.*
[26] *Ibid.*
[27] *Ibid.*
[28] *Id.* at 7, 9 (¶¶ 5, 7).

constant observation for his own protection, a staff member allowed another patient into the shower area while Allen was there.[29]

During his time on unit restrict, Allen "was deprived" of his right to attend religious services.[30] He missed Rosh Hashana, Yom Kippur, and regular church services.[31]

More generally, the conditions at Whiting were appalling: the food was low-quality and lacking calories, the surroundings were dirty and dingy, the group showers offered no privacy, and other patients' poor hygiene created a constant foul odor.[32]

### *Dutcher*

After almost three months at Whiting, Allen was transferred to Dutcher—a lower-security division at the same facility—where his troubles persisted.[33] At this new location, Dr. Dreisbach was "entrusted with [Allen's] care and the sole ability to discharge him once admitted."[34]

Dr. Dreisbach continued Dr. Sidaros's medication regimen, injecting Allen with an anti-psychotic rather than allowing him to take tablets orally.[35] Allen's assailant from Whiting was also transferred to Dutcher and placed on the same unit as Allen.[36] Another patient at Dutcher locked Allen in a room and challenged him to a fight.[37] One night, Allen awoke with a patient's hands around his neck.[38] Yet Dr. Dreisbach did not discharge Allen to his home or to another facility where he might have been safer.[39]

---

[29] *Id*. at 9 (¶ 7).
[30] *Id*. at 6 (¶ 3).
[31] *Ibid*.
[32] *Id*. at 6 (¶ 3).
[33] *Id*. at 3 (¶ 2).
[34] *Id*. at 2.
[35] *Id*. at 11 (¶ 10).
[36] *Id*. at 8-9 (¶ 7).
[37] *Id*. at 9 (¶ 7).
[38] *Ibid*.
[39] *Id*. at 11 (¶ 10).

After four months at Dutcher, Allen was released to a "respite house" for several more months.[40] He does not allege that Dr. Sidaros or Dr. Dreisbach were involved with his care or the conditions at the respite house.

Allen filed this federal court action in August 2020, alleging constitutional civil rights claims under 42 U.S.C. § 1983 against Dr. Sidaros and Dr. Dreisbach.[41] Both doctors have moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim.[42] Allen in turn has moved to amend his complaint to add a claim for denial of his First Amendment right to the free exercise of his religion and also to join New Haven County and Middlesex County as additional defendants.[43]

## DISCUSSION

The standard that governs a motion to dismiss under Rules 12(b)(1) and 12(b)(6) is well established. Under Rule 12(b)(1), a complaint may not survive unless it alleges facts that, taken as true, give rise to plausible grounds to sustain subject matter jurisdiction. *See Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155–56 (D. Conn. 2016).[44] Similarly, under Rule 12(b)(6) a court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

For purposes of evaluating the defendants' motion to dismiss, the Court must liberally construe Allen's *pro se* complaint and interpret it to raise the strongest grounds for relief that its

---

[40] *Ibid.* (¶ 11).
[41] Doc. #1. Allen also initially alleged claims against the attorney who represented him in civil commitment proceedings. These claims were later withdrawn upon the filing of an amended complaint and after I issued an order to show cause raising concerns about the validity of his claims against his attorney. *See Allen v. Sidaros*, 2020 WL 7773421 (D. Conn. 2020); Doc. #7 (order to show cause); Doc. #10 (first amended complaint).
[42] Doc. #15.
[43] Docs. #23, #24.
[44] For purposes of readability, my quotations from court decisions in this ruling omit internal citations, quotation marks, and bracketing unless otherwise noted.

allegations suggest. *See Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013). Still, even a *pro se* complaint may not survive a motion to dismiss if its factual allegations do not establish at least plausible grounds for the Court to enter a grant of relief. *See Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Where, as here, a plaintiff alleges an individual-capacity claim against a defendant pursuant to 42 U.S.C. § 1983 for a violation of the plaintiff's federal constitutional rights, a defendant may assert a defense of qualified immunity. *See Horn v. Stephenson*, 11 F.4th 163, 168 (2d Cir. 2021). The doctrine of qualified immunity protects a government official or employee from liability for money damages stemming from a violation of the Constitution if the official engaged in conduct that an objectively reasonable official would not necessarily have known at the time amounted to a violation of the plaintiff's constitutional rights. *Id.* at 168–69. Thus, in order for a plaintiff to overcome a defense of qualified immunity, the plaintiff must show that the defendant violated a right of the plaintiff that was clearly established law at the time of the conduct in question. *Id.* at 169.

When a defendant raises a defense of qualified immunity at the pleadings stage, a court must take care not to engage in a premature determination of the facts in a manner at odds with those facts that the plaintiff has pleaded in the complaint. "A defendant presenting an immunity defense on a motion to dismiss must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018).

### The Rooker-Feldman *doctrine*

The defendants argue that Allen's claims are jurisdictionally barred under the *Rooker-Feldman* doctrine to the extent that they are based on Allen's court-ordered involuntary commitment and court-ordered administration of medications. The *Rooker-Feldman* doctrine jurisdictionally bars the federal courts from hearing "cases that function as *de facto* appeals of state-court judgments." *Sung Cho v. City of New York*, 910 F.3d 639, 644 (2d Cir. 2018). There are four requirements that must be met in order for the *Rooker-Feldman* doctrine to bar a plaintiff's claim: "(1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced." *Id*. at 645.

All four of these requirements are met here. First, Allen lost in the state courts when the judgments related to his involuntary commitment and medication were issued. Second, the injuries he complains of were caused by the state court judgments that authorized his involuntary commitment and medication. Third, to rule in favor of Allen's challenges to the fact and location of his commitment and to the administration of medications would involve review and rejection of the state court judgments themselves. Fourth, those judgments were rendered before these federal proceedings commenced. *See Middleton v. United States*, 2012 WL 394559, at *4 (E.D.N.Y. 2012) (Bianco, J.) (*Rooker-Feldman* doctrine barred § 1983 money damages claim challenging defendants' enforcement of mental health commitment and medication orders); *Spencer v. Bellevue Hosp.*, 2012 WL 1267886, at *5 (S.D.N.Y. 2012) (same). Accordingly, to the extent that Allen bases his claims against the defendant doctors on their enforcement of the

state court orders of involuntary commitment and medication, there is no federal jurisdiction over Allen's claims.

### *Claims outside the* Rooker-Feldman *doctrine*

Although the complaint is somewhat discursive, it alleges few facts as to Dr. Sidaros or Dr. Dreisbach that fall outside the scope of what is jurisdictionally barred under the *Rooker-Feldman* doctrine. It does not, for example, appear to allege that either Dr. Sidaros or Dr. Dreisbach detained or medicated Allen without resort to lawful court process and in accordance with a state court order.[45] To the extent that the complaint may be interpreted to challenge actions outside the scope of the *Rooker-Feldman* doctrine, I conclude for the reasons set forth below that these allegations do not establish plausible grounds for relief against Dr. Sidaros or Dr. Dreisbach.

### 1. *Physician's Emergency Certificate*

Allen faults Dr. Sidaros for seeking his temporary involuntary commitment by means of a physician's emergency certificate (PEC) after the criminal charges against him were dismissed. But this is the established statutory procedure for a physician in Connecticut to initiate involuntary civil commitment proceedings. Connecticut law authorizes a physician—without a prior court order—to issue an emergency certificate for commitment as long as 15 days of "[a]ny person who the physician concludes has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities." Conn. Gen. Stat. § 17a-502(a).[46]

---

[45] So, for example, the complaint describes an initial interaction with Dr. Sidaros in which Dr. Sidaros did *not* force Allen to take an anti-psychotic medication but instead allegedly engaged in "medical malpractice" by insisting that he take both Depakote and the anti-psychotic medication or neither. Doc. #23 at 7 (¶ 4).

[46] Under Connecticut law, a person is considered "dangerous to himself or others" if "there is a substantial risk that physical harm will be inflicted by an individual upon his or her own person or upon another person." Conn. Gen. Stat. § 17a-495(a). A person is "gravely disabled" if that "person, as a result of mental or emotional impairment, is in danger of serious harm as a result of an inability or failure to provide for his or her own basic human needs such

In *Bolmer v. Oliveira*, 594 F.3d 134 (2d Cir. 2010), the Second Circuit considered whether a Connecticut state doctor could be liable for a constitutional violation of substantive due process in connection with his issuance of a physician's emergency certificate. The court noted at the outset that "[s]ubstantive due process prohibits states from involuntarily committing nondangerous mentally ill individuals," but that substantive due process "does not, however, require a guarantee that a physician's assessment of dangerousness be correct." *Id.* at 142. Instead, "a physician's decision to involuntarily commit a mentally ill person because he poses a danger to himself or others shocks the conscience, thereby violating substantive due process, when the decision is based on substantive and procedural criteria that are substantially below the standards generally accepted in the medical community." *Id.* at 143. This standard does not allow a state psychiatrist to be liable for mere negligence but only for misconduct that amounts to at least gross negligence. *Id.* at 144.

Even crediting Allen's version of the facts, the complaint alleges grounds for Allen to disagree with Dr. Sidaros's assessment but does not allege additional facts to suggest that Dr. Sidaros acted on the basis of substantive or procedural standards that were substantially below the standards generally accepted in the medical community. *Compare Best v. Schneider*, 2015 WL 5567062, at *21 (E.D.N.Y. 2015) (complaint alleged that doctors signed certifications for commitment without personally examining the plaintiff).

Allen has not alleged facts to show gross negligence or a clear constitutional violation as required to overcome a defense of qualified immunity. To the contrary, the complaint acknowledges that Allen had very recently been ordered committed by a state court judge

---

as essential food, clothing, shelter or safety and that hospital treatment is necessary and available and that such person is mentally incapable of determining whether or not to accept such treatment because his judgment is impaired by his psychiatric disabilities." *Ibid.*

pursuant to an evaluation by a different physician (Dr. Zhong).[47] The complaint itself acknowledges that Allen had "severe addiction and mental illness issues" and that around the same time that Dr. Sidaros sought the PEC Allen had become "sometimes inappropriate and hostile, with both staff and other patients."[48]

The complaint alleges that "the plaintiff feels being diagnosed and labeled as gravely disabled was negligent by the doctor and probate court judge."[49] But, as noted above, simple negligence is not enough to sustain a substantive due process claim.

Allen insists that he had no prior criminal history and that the criminal charges against him were dismissed.[50] But Allen does not explain why these mitigating facts about his criminal charges tend to show there were no proper grounds for a physician to issue an emergency certificate for involuntary civil commitment. The nature or disposition of criminal charges may have little to do with whether a person is in need of involuntary mental health treatment. Therefore, even crediting Allen's own factual allegations, he has not alleged facts to plausibly show that Dr. Sidaros acted with gross negligence in violation of professional norms, much less facts to show that any objectively reasonable psychiatrist would have known that Allen should not have been subject to a physician's emergency certificate to initiate involuntary civil commitment proceedings.

2. *False testimony at probate court hearing*

Allen further alleges that Dr. Sidaros "shared a number of factual inaccuracies" amounting to "perjury" when he testified before the probate court in support of Allen's

---

[47] Doc. #23 at 3-5 (¶ 2). Although Allen vehemently disputes the basis for Dr. Zhong's findings against him, he alleges no grounds why Dr. Sidaros could not reasonably have taken into account Allen's recent history including the conclusions of Dr. Zhong and the prior court order of commitment based on these conclusions.
[48] *Id.* at 7, 11 (¶¶ 5, 9)
[49] *Id.* at 11 (¶ 9).
[50] *Id.* at 4-6 (¶ 2).

involuntary commitment.[51] But the complaint does not describe what statements of Dr. Sidaros were false, and it is well-established in any event that witnesses in court proceedings have absolute immunity from a § 1983 claim for money damages that is based on the content of their court testimony. *See Rehberg v. Paulk*, 566 U.S. 356, 371 (2012); *Chapdelaine v. Town of Eastford*, 708 F. App'x 699, 702 (2d Cir. 2017).

3.   *Place of confinement*

Allen complains that he should not have been detained at institutions for the "*criminally insane.*"[52] But he does not allege any facts to suggest that Dr. Sidaros or Dr. Dreisbach had authority to decide on a different hospital facility for Allen other than Whiting or Dutcher. Although Allen further claims that Whiting is a facility reserved for the criminally insane, the Court takes judicial notice of the Connecticut Department of Mental Health and Addiction Services website, which describes Whiting as providing services to individuals who are committed either criminally or civilly.[53] In any event, assuming that Allen met the standard for involuntary mental health treatment, Allen does not point to any clearly established constitutional right to be designated to a particular type of mental health facility or to be treated at a facility that does not have persons who are subject to criminal charges.

4.   *Early discharge*

Allen complains that Dr. Sidaros and Dr. Driesbach should have discharged him earlier than they did. Notwithstanding the entry of a court order of commitment, the *Rooker-Feldman*

---

[51] *Id*. at 9 (¶ 8). The complaint does not allege that Dr. Sidaros made any knowingly false statements in the physician's emergency certificate that led to the involuntary commitment proceedings.
[52] *Ibid.*
[53] *See* Connecticut Dept. of Mental Health and Addiction Services, Whiting Forensic Hospital, https://portal.ct.gov/DMHAS/WFH/Whiting-Forensic-Hospital (last accessed Feb. 14, 2022) ("Whiting Forensic Hospital provides high quality, comprehensive, and individualized treatment and evaluation services for patients with mental health conditions who are involved in the criminal justice system *or are not yet ready to be safely treated in less restrictive settings*.") (emphasis added).

doctrine does not foreclose a plaintiff's challenge to a doctor's discretionary decision not to discharge the plaintiff at such time that the plaintiff no longer meets the criteria for involuntary commitment. *See Morrison v. City of New York*, 591 F.3d 109, 115 (2d Cir. 2010). Still, Allen does not allege any particular facts to suggest a change of condition or circumstances that should have prompted either one of the doctors to discharge him at an earlier time.

5. *Additional deprivations not related to Dr. Sidaros or Dr. Driesbach*

Allen complains of numerous deprivations without alleging facts to suggest that Dr. Sidaros or Dr. Driesbach were personally involved or responsible. For example, Allen complains that he was deprived of his right to counsel and trial.[54] But these alleged procedural deprivations have no apparent relation to Dr. Sidaros or Dr. Driesbach.

Allen further complains about numerous offensive incidents and conditions of confinement while at Whiting and Dutcher, including his designation for a time to unit restrict status, his exposure to intimidation and assaults from other detainees, and the generally poor living conditions. But Allen does not allege facts to show that Dr. Sidaros or Dr. Driesbach were personally involved with or responsible for these alleged deprivations.[55] Both Dr. Sidaros and Dr. Driesbach are alleged to be medical professionals charged with furnishing psychiatric care, and it not plausible to conclude without more that they controlled and had personal knowledge of all aspects and incidents of living conditions and security at Whiting and Dutcher. The complaint

---

[54] Doc. #23 at 4-5

[55] The complaint alleges in passing that there were "a number of disciplinary incidents where [Allen] was forced into [a] solitary confinement room and given forced medications … unjustifiably by Dr. Sidaros, including one for 'coughing too loudly' and one for calling [him] by his first name Rafik rather than calling him Dr. Sidaros." *Id*. at 7-8 (¶ 5). This allegation does not make clear whether it was Dr. Sidaros or someone else who forced Allen into a solitary confinement room. Even assuming that Dr. Sidaros ordered Allen to a solitary confinement room, the complaint alleges no further facts to suggest how any particular incident was so unwarranted or disproportionate as to amount to a violation of Allen's constitutional rights. With respect to forced medication, in light of the abovementioned probate court order authorizing forced medication Allen has not clearly alleged that Dr. Sidaros independently compelled him to be medicated without a court order to do so.

lacks non-conclusory allegations to show that the roles of Dr. Sidaros and Dr. Dreisbach extended beyond medical services to include dictating the general conditions of Allen's confinement at Whiting or Dutcher. Their general supervisory status is not enough to establish their liability absent allegations of personal involvement in the denial of particular rights. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).

In short, I will grant the defendants' motion to dismiss. Most of Allen's claims are barred by the *Rooker-Feldman* doctrine. His remaining allegations neither allege plausible grounds for relief nor suffice to overcome the defendants' claim of qualified immunity.

### Leave to amend complaint

Allen has moved for leave to file an amended complaint that adds a First Amendment free exercise claim against Dr. Sidaros and Dr. Dreisbach and that also joins New Haven County and Middlesex County as defendants.[56]

A court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). "[W]here, as here, a plaintiff moves for leave to amend his complaint to add new claims and parties, a court will look to whether the opposing party is unduly prejudiced, whether plaintiff has unduly delayed in seeking the proposed amendment, and whether the proposed amendment would be futile." *Brown v. Dirga*, 2016 WL 6080618, at *2 (D. Conn. 2016). A court may deny leave if a proposed amendment to a complaint "could not withstand a motion to dismiss." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164–65 (2d Cir. 2015).

1. *First Amendment free exercise claim*

Allen seeks leave to amend his complaint to add a claim against Dr. Sidaros and Dr. Driesbach for the violation of his right to the free exercise of his religion. He alleges that

---

[56] Docs. #23, #24.

"despite being raised Jewish and being Christian at the time of institutionalization and currently, plaintiff was deprived [of] the right to attend Yom Kippur, Rosh Hashana and Church services while on unit restrict" at Whiting.[57] He further alleges that "[t]here was no religious services at Dutcher and I wasn't offered the services of a chaplain while at Dutcher."[58]

There is no doubt that Allen retained his constitutional right to the free exercise of his religion while he was subject to involuntary commitment. *See Salahuddin v. Goord*, 467 F.3d 263, 276–78 (2d Cir. 2006) (prisoner has right to free exercise even while in "disciplinary keeplock"). But the problem here is that Allen does not allege that either Dr. Sidaros or Dr. Driesbach ordered him to be deprived of his right to the free exercise of religion.

Nor does Allen allege that he ever requested an opportunity to attend services or to meet with a chaplain. Therefore, he has not alleged enough facts to establish a plausible free exercise claim, much less a plausible free exercise claim against Dr. Sidaros or Dr. Dreisbach. *See Sindram v. Saxton*, 955 F.2d 42, at *2 (4th Cir. 1992) (*per curiam*) (noting that "[t]he right to practice religion is entitled to a preferred position in the catalogue of constitutional rights" but that "absent an allegation that [the detainee] actually requested religious services and was turned down, summary judgment in this case was proper" and that "to the extent that [the detainee] asked to attend religious services, only the prison official who denied his request could be liable for the denial, and there is no evidence that either of the named Defendants denied such a request"); *Kusulas v. Carin*, 2007 WL 9718868, at *5 (E.D.N.Y. 2007) (dismissing psychiatric patient's free exercise claims because he did not allege "that he expressed his desire to attend [a religious] service to defendants or anyone else"). Accordingly, I will deny without prejudice Allen's motion for leave to amend his complaint to allege a free exercise claim.

---

[57] Doc. #23 at 6 (¶ 3).

[58] *Ibid.*

2.  *Additional county defendants*

Allen seeks leave to join two more defendants: New Haven County and Middlesex County. He states that "it appears from stumbling upon an internet search that suing the county is the way to broadly sue a municipality in a Section 1983," and that he has chosen to sue the counties because "New Haven County [is] where Meriden Court and CMHC [the Connecticut Mental Health Center] is located, and Middlesex County [is] where Whiting, Dutcher, and the Middletown Probate Court are located."[59]

I will deny Allen's motion to join the two county defendants because Connecticut no longer has county governments that are amenable to being sued. "County government in Connecticut came to an end on October 1, 1960. On and after that date all property of any kind belonging to the several counties of the state and all the powers and authority of those counties vested in the state." *City of New London v. New London Cty.*, 148 Conn. 605, 610 (Conn. 1961) (citing Conn. Gen. Stat. § 6-2a).

"Cases examining whether a particular entity is a 'person' for the purposes for section 1983 look to whether it is an 'independent legal entity' capable of suing and being sued." *Watrous v. Town of Preston*, 902 F. Supp. 2d 243, 255 (D. Conn. 2012). Because Connecticut's counties no longer have an independent legal status, they are not amenable like a municipality to suit under § 1983. *See* Conn. Gen. Stat. § 52-73 (allowing municipal corporations including towns, societies, communities, and corporations—but not counties—to sue and be sued); *id*. § 7-148(a) (defining the term "municipality" to include "any town, city or borough, consolidated town and city or consolidated town and borough," but not including any county).[60] These

---

[59] Doc. #23 at 3 (¶ 2).
[60] Prior to 1959, Connecticut law specifically authorized counties to sue and be sued. *See State Bar Ass'n of Conn. v. Connecticut Bank & Tr. Co.*, 20 Conn. Supp. 248, 265 (Super. Ct. 1957) (quoting predecessor statute § 52-73, which included counties in the list of municipal corporations that may sue and be sued).

enabling statutes are construed strictly in determining whether a governmental unit is amenable to suit. *See Farmington-Girard, LLC v. Plan. & Zoning Comm'n of City of Hartford*, 2019 WL 935500, at \*10–11 (D. Conn. 2019) (dismissing § 1983 claims against a planning and zoning commission because it was not authorized to sue or be sued under state law).

Moreover, even assuming that a Connecticut county may be named as a party defendant in a federal lawsuit, any county property is vested by law in the state government, which has in turn assumed any "debts, obligations, liabilities and duties" of the county. Conn. Gen. Stat. § 6-2a. Therefore, Allen's claims in federal court against the counties would be barred by the Eleventh Amendment. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1290–91 (2017); *T.W. v. New York State Bd. of L. Examiners*, 996 F.3d 87, 92 (2d Cir. 2021).

In addition, Allen does not allege any wrongful conduct by any county or county official that might serve as the basis for a claim against them. As his complaint explains, he seeks to add the two counties as defendants only because of the happenstance that the particular courts and facilities at issue in this case are physically located within the geographical areas covered by these counties. Accordingly, for all these reasons, I will deny with prejudice Allen's motion to amend the complaint to add New Haven County and Middlesex County as defendants.

## CONCLUSION

For the reasons stated above, the Court GRANTS the defendants' motion to dismiss the complaint (Doc. #15) and DENIES Allen's motions for leave to amend the complaint to add a new claim and to join two new defendants (Docs. #23, #24). With the exception of Allen's motion to join the two county defendants, these rulings are without prejudice to the filing of an amended complaint on or before **March 18, 2022** if Allen believes in good faith that he can allege additional facts that overcome the concerns stated in this ruling.

It is so ordered.

Dated at New Haven this 16th day of February 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge